Filed 11/14/24  P. v. Perez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALFREDO PEREZ,<br><br>Defendant and Appellant. | F086004<br><br>(Super. Ct. No. BF187827A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, and Kenneth C. Twisselman II, Judges.*

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\* Judge Brehmer ruled on motion to suppress; Judge Twisselman presided over all other hearings pertinent to this appeal.

Defendant Alfredo Perez pled no contest to voluntary manslaughter after his motion to suppress inculpatory statements was denied. Defendant was sentenced to 14 years. On appeal, defendant contends the trial court erred in denying his motion to suppress the inculpatory statements he made at the sheriff's department because the court found his initial arrest and detention unlawful. Defendant argues his statements were the fruits of his illegal arrest and should have been suppressed. The People maintain there was sufficient attenuation between the arrest and defendant's inculpatory statements, and they were rightfully admitted.

This court requested supplemental briefing for the parties to address whether defendant's sentence was unauthorized pursuant to a stipulated plea agreement in light of Penal Code[1] section 1170, subdivision (b), as amended by Senate Bill No. 567 (2021– 2022 Reg. Sess.) (Senate Bill No. 567). Defendant argues his sentence is unauthorized and remand is required for the trial court to appropriately apply section 1170, subdivision (b) to his sentence. The People disagree, arguing defendant agreed to the terms in a stipulated plea agreement after the effective date of the recent amendments to section 1170, subdivision (b), the trial court did not exercise discretion in imposing the terms, and section 1170, subdivision (b) is inapplicable to a stipulated plea agreement.

We affirm.

## PROCEDURAL BACKGROUND

On March 24, 2022, the Kern County District Attorney filed an information charging defendant with willful, deliberate, and premeditated murder of Diego Soto (§ 187, subd. (a); count 1). As to count 1, the information alleged defendant personally and intentionally discharged a firearm, causing death (§ 12022.53, subd. (d)). The information also alleged the following aggravating factors: defendant committed a crime

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

of great violence (Cal. Rules of Court, rule 4.421(a)(1))[2]; and defendant was armed with or used a weapon at the time of the crime (rule 4.421(a)(2)).

On January 4, 2022, defendant filed a motion to suppress (§ 1538.5). The People filed an opposition to defendant's motion on January 7, 2022.

On January 25, 2022, the trial court held a preliminary hearing. After the preliminary hearing, the court ruled on defendant's motion to suppress. The court held the arrest and detention of defendant was illegal and the keys found in a search incident to arrest were suppressed. The court further found the inculpatory statements defendant made at the sheriff's department were sufficiently attenuated from his illegal arrest and admissible.

On January 20, 2023, the information was amended to charge defendant with voluntary manslaughter of Soto (§ 192, subd. (a); count 2).[3] As to count 2, the information was further amended to allege defendant used a firearm during the commission of the crime (§ 12022.5, subd. (a)) and to include a single aggravating factor: defendant was armed with or used a weapon at the time of the crime (rule 4.421(a)(2)).

On the same date, pursuant to a negotiated plea agreement, defendant pled no contest to count 2 (§ 192, subd. (a)) and admitted the firearm enhancement (§ 12022.5, subd. (a)). Defendant also admitted the aggravating factor that he was armed with or used a weapon at the time of the crime (rule 4.421(a)(2)). In exchange for his no contest plea, the plea agreement provided that the prosecutor would dismiss count 1 and defendant would be sentenced to the upper term of 11 years on count 2, plus a three-year firearm enhancement.

On March 24, 2023, the trial court imposed the agreed-upon sentence.

---

[2] All further rule references are to the California Rules of Court.

[3] The information was orally amended on January 20, 2023, by the prosecutor pursuant to a plea agreement.

On the same date, defendant filed a notice of appeal.

## FACTUAL BACKGROUND[4]

On October 23, 2021, a sheriff's deputy was dispatched to a shooting that occurred at an intersection in Bakersfield in Kern County at about 2:25 a.m. Upon arrival, the deputy saw that Soto had a gunshot wound to his left pectoral. Soto was pronounced dead at the scene.

Detective R. Brock from the Kern County Sheriff's Office also arrived at the scene on the night of the shooting. When Brock arrived, there were multiple police cars on the scene. The police department had also responded to the shooting and detained witnesses for interrogation. Thereafter, the sheriff's department assumed investigation because the shooting occurred in the sheriff's jurisdiction.

Brock spoke to Soto's girlfriend, who witnessed the shooting. Soto's girlfriend said she was with Soto and two other males the night of the shooting. After Soto's group left a concert in the area, the group began walking down the street together when a gray sedan pulled over to the shoulder and three male subjects got out. The males asked where Soto's group was from. Thereafter, the driver of the gray sedan started to fight with Soto's group. Soto's girlfriend tried to break up the fight. Thereafter, Soto's group walked away down the street when the driver of the gray sedan attacked Soto and hit him several times. Then, the driver took out a black semiautomatic handgun and fired one shot at Soto.

After the driver shot Soto, the driver and his group jumped back into the gray sedan. Soto's girlfriend took a photograph of the gray sedan as it was pulling away. A records check revealed defendant was the registered owner of the gray sedan involved in the shooting. When Brock obtained a copy of defendant's driver's license and showed

---

**4** The factual background provided is drawn from the testimony presented at the preliminary hearing except as otherwise noted.

4.

the photograph to Soto's girlfriend, she began to cry and told Brock she was 70 percent confident defendant was the driver of the gray sedan and the individual who shot Soto.

Later that afternoon, at about 12:50 p.m., an undercover Bakersfield police officer was operating near defendant's address when he saw defendant's gray sedan parked in front of a residence. The gray sedan stood out to the officer because he knew it matched the "suspect description for a shooting vehicle." The undercover officer saw defendant exit the residence, speak to another man, and return inside. Defendant matched the photograph and description the officer was provided as the suspect in a homicide investigation. The undercover officer advised other police officers in the area that he had located a homicide suspect via radio broadcast. He requested that the other officers stay in the area.

A short time later, the undercover officer saw defendant get into the front passenger side of a different silver car. The undercover officer sent out another radio broadcast advising that defendant was a passenger in the silver car that "fled westbound" down the street with a female driver. The undercover officer provided a description of the vehicle, the occupants, and the direction in which the silver car was traveling.

Another Bakersfield police officer, A. Celedon saw the silver car after hearing the broadcast from the undercover officer. He noticed the silver car had "paper plates" in violation of Vehicle Code section 5200, subdivision (a) and matched the description of the car the "suspect" was seen getting into.

Celedon and his partner conducted a traffic enforcement stop of the silver car at about 2:35 p.m. on October 23, 2021. The silver car pulled over. Celedon approached the passenger side of the car and defendant identified himself. Defendant exited the car and Celedon conducted a patdown search of defendant. The search of defendant revealed keys in defendant's pocket. Defendant was handcuffed and placed in the back of the police car. Celedon acknowledged that the paper plates on the silver car did not expire until two days after the date he conducted the vehicle stop in this case.

5.

About 40 minutes later, Sergeant J. Newell from the Kern County Sheriff's Office arrived on scene and asked defendant if he would come to the sheriff's department to speak to a detective about an investigation; defendant agreed. A deputy from the "Electronic Monitoring Program" transported defendant to the sheriff's department.

Newell told Brock defendant was "willing" to come speak to the detective about an investigation.[5] When defendant walked into the interview room and while he was being questioned, he was not handcuffed. Defendant waited in the interview room for nearly one hour before the interview began.[6]

Brock thanked defendant for coming in voluntarily, and defendant responded, "[N]o problem." Brock collected identifying information from defendant, as well as asked him what he did the night before. Defendant told the detective that he owned the gray sedan, matching the license and description of the gray sedan involved in the shooting about 12 hours before, and that no one else drove the gray sedan the previous day.

Defendant was offered water and took a break from the interview. Once the interview resumed, defendant was read his *Miranda* rights.[7] Defendant responded, "Yes" he understood after each *Miranda* right was provided to him. Defendant then gave Brock

---

[5] We note defendant objected to this testimony as inadmissible hearsay. The trial court allowed the answer and reserved for future ruling. The record does not reflect that defense counsel followed up on his objection or specifically requested a ruling. Defendant now argues on appeal this testimony is inadmissible even though the court never ruled on the objection. However, the trial court's failure to rule on the objection weighs in favor of admissibility. (See *People v. Flores* (1979) 92 Cal.App.3d 461, 466 [where court reserves its ruling on an objection by a party, the court's failure to rule formally "constituted an implied ruling against the objection and in favor of admissibility"].) Defendant does not request appellate review of the objection, and we decline to do so. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1029 [points not supported by legal argument and citation to authority may be treated as waived].)

[6] We have viewed the entire interview with the detectives and read the transcript.

[7] *Miranda v. Arizona* (1966) 384 U.S. 436.

his cell phone passcode. When asked if the detective could search his phone, defendant said, "Go ahead."

Thereafter, defendant admitted a fight broke out with people he did not know. Defendant claimed the other group started the fight, he was hit, and a female scratched his face. Defendant said after being attacked by a male and female, he backed up and pulled a black gun out. Defendant warned the other group to stop, but they would not stop fighting him. About one hour into the interview, defendant claimed he pointed the gun at Soto and shot him once from about 10 feet away. Defendant said he "panicked" after the shot was fired and everyone in his group got back into his gray sedan and left the area.

## DISCUSSION

### I.     Suppression of Defendant's Statements Made at Sheriff's Department

Defendant argues the trial court erred in denying his motion to suppress statements he made to detectives at the sheriff's department because his statements resulted in an exploitation of his illegal arrest. Defendant contends neither the *Miranda* warnings, the temporal proximity between arrest and statement, nor the transfer in custody from one agency to another was sufficient to purge the taint from his illegal arrest. The People disagree. The People respond that defendant's statements were sufficiently attenuated from the initial arrest and suppression is not warranted. We agree with the People.

### A. Additional Background

Defense counsel filed a motion to suppress the physical evidence seized by police officers during the patdown search of defendant after a traffic stop and initial arrest. Defendant also sought to suppress statements he made to detectives at the sheriff's department following the arrest. Defense counsel argued at the hearing on the motion to suppress that since there was no probable cause to detain and arrest defendant, all physical evidence and verbal statements should be suppressed as a result of the doctrine of "fruit of the poisonous tree."

7.

The prosecutor opposed defendant's motion to suppress. The prosecutor argued police officers had reasonable suspicion to stop defendant's vehicle and detain him because he was a suspect in a homicide case, and the officers conducted a valid search incident to lawful arrest. At the hearing on the motion to suppress, the prosecutor also argued that even if the arrest was illegal, there was sufficient attenuation between the arrest and statements defendant made to detectives at the sheriff's department.

Prior to ruling on defendant's motion to suppress, the court commented, "[t]he testimony is that [defendant] was asked if he wanted to go to the sheriff's department, and he said yes, he voluntarily wanted to go." The court further noted that once defendant arrived at the sheriff's department, "he's thanked for voluntarily being there." The court said, "I don't have any evidence [defendant] said he was voluntarily [at the sheriff's department], but that's . . . the presumption of Detective Brock based on information given to him and his own observation." The court determined there was no Vehicle Code section 5200 violation.

In ruling on defendant's motion to suppress, the trial court found defendant's arrest and detention illegal and in violation of defendant's Fourth Amendment rights because the officers tried to justify the stop when they said there was a "paper plate violation."

However, the trial court denied defendant's motion to suppress as to the statements he made at the sheriff's department.

The trial court explained:

"[T]here was a Fourth Amendment violation by the Bakersfield Police Department, and that's evident . . . [the Bakersfield Police Department] [was] trying to justify the stop by saying there was a paper plate violation, which there clearly was not.

"[T]he only part . . . that is suppressed are the keys found on the defendant. Once the defendant goes to the sheriff's department . . . the sheriff's department . . . want[ed] to detain him. They were looking for him . . . and [wanted to] question him.

"[Defendant] was *Mirandized* by the sheriff's department. . . . This is not a situation where, by way of example, the first agency goes and pulls the defendant out of his house and interrogates him, or pulls him out of a vehicle and interrogates him based on an incorrect statement or falsehood that they were bad license plates . . . .

". . . [Bakersfield Police Department] . . . [was] on scene. [Bakersfield Police Department] knew that there was information . . . that [defendant] was somehow connected and may have been a suspect.

". . . Detective Brock . . . testified that he told the [Bakersfield Police Department] officers on scene that [Soto's girlfriend] . . . said . . . [she was] 70 percent [confident defendant was the shooter]. I think that's exactly what the testimony was. I'm not sure that that's why the [Bakersfield Police Department] officers pulled over this vehicle. [¶] . . . [¶]

"Then there's testimony that there's a Vehicle Code violation [and] also [the vehicle was] pulled over because [defendant is] a suspect . . . . I think the officers were trying to do their job.

"The information is that there's a suspect. It seems to be . . . [defendant]. They think so, but the way that they got to that wasn't the right way. So the keys are suppressed. The statement is not. . . ." (Italics added.)

Thereafter, defense counsel filed a motion in limine requesting the trial court consider the admissibility of defendant's statements made at the sheriff's department for Fifth Amendment purposes, on the grounds the statements were in violation of *Miranda*.[8]

The motion was granted in part as to the statements defendant made prior to being given his *Miranda* rights except for those that related to identity or biographical information. As to the statements defendant made post-*Miranda*, the court denied the motion and ruled that the statements were admissible.

---

[8] Defense counsel also filed a motion in limine requesting the trial court exclude defendant's statements for Fourth Amendment purposes, on the ground that they were the result of an illegal search and seizure. The court found the issue was already resolved at the hearing on the motion to suppress and the motion was denied.

The trial court's findings regarding the exclusion of defendant's statements made at the sheriff's department at the motion in limine hearing largely overlapped with the court's decision at the motion to suppress hearing when it declined to suppress defendant's statements.[9] The court reasoned:

> "Even when a first statement is taken in the absence of proper advisements and is incriminating, so long as the first statement was . . . voluntary, a subsequent voluntary confession ordinarily is not tainted simply because it was procured after a *Miranda* violation.
>
> "And I do find, based on the evidence that I have reviewed in this case and the testimony given, that the defendant was responding to uncoercive questioning during the pre-warning part of the interview . . . the statements [defendant] made both pre-warning and post-warning were voluntary and were . . . the product of the defendant's rational and intelligent choice on the second phase to confess. And I am going to find them admissible under those grounds.
>
> ". . . [G]oing back to the . . . six factors . . . the completeness and detail of the questions and answers in the first round of interrogation, I find that the evidence in this case would give that factor very little weight because not much . . . was said . . . .
>
> "The overlapping content of the two statements . . . I find very little overlapping content between the two. [¶] The timing and setting of the first and second. [The detective and defendant] . . . [took] a recess or . . . a break between the first part and coming back to give the *Miranda* advisal. . . . I find that significant.
>
> ". . . [T]he post-warning statements did not violate *Miranda*, were not the product of an improper two-step interrogation technique; that this was not done in a calculated way to undermine the *Miranda* warning within the meaning of the case law. [¶] . . . [T]he motion is granted in part as to the first part of the interview pre-warning, and it's denied as to the post-warning." (Italics added.)

---

[9] In so ruling, the trial court reviewed the transcript from the preliminary hearing as well as the video-recorded interview of defendant at the sheriff's department.

## B. Standard of Review

" ' "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1140.) "On appeal, we independently review the second and third determinations, but we apply ' " 'the deferential substantial-evidence standard' " ' to the court's determination of the historical facts." (*People v. Douglas* (2015) 240 Cal.App.4th 855, 860.) "[T]he trial court's ruling must be upheld if there is any basis in the record to sustain it." (*Ibid*.)

## C. Defendant's Initial Arrest and Detention

Defendant does not appeal the trial court's finding that his initial arrest and detention was unlawful. While the People dispute the legality, we need not determine whether defendant's initial arrest and detention was unlawful. As we shall explain, we find defendant's statements at the sheriff's department to be sufficiently attenuated from the detention and arrest that suppression of the statements is not warranted.

## D. Attenuation

"The purpose of the exclusionary rule in Fourth Amendment cases . . . is to deter the police from engaging in unlawful searches and seizures." (*People v. Gonzalez* (1998) 64 Cal.App.4th 432, 440 (*Gonzalez*).) "Instead of a per se or 'but for' rule, '[t]he question whether a confession is the product of a free will . . . must be answered on the facts of each case.' " (*Ibid*.) " ' "[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " ' " (*People v. Brendlin* (2008) 45 Cal.4th 262, 268.)

11.

The Supreme Court in *Brown v. Illinois* (1975) 422 U.S. 590 (*Brown*), identified four factors a trial court should consider in determining whether a defendant's confession was the product of free will or the result of exploiting an illegal arrest. "The *Miranda* warnings are an important factor . . . in determining whether the confession is obtained by exploitation of an illegal arrest." (*Id*. at p. 603.) Other factors are: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, [citation], and, particularly, the purpose and flagrancy of the official misconduct are all relevant. [Citation.] The voluntariness of the statement is a threshold requirement." (*Id*. at pp. 603–604, fns. omitted.)

### 1. The *Miranda* warnings

The parties agree, as do we, that defendant was read his *Miranda* rights. Defendant waived his right to remain silent and to an attorney prior to confessing to the crime. This factor weighs in favor of attenuation for purposes of whether there was a Fourth Amendment violation. (See, e.g., *Gonzalez*, *supra*, 64 Cal.App.4th at pp. 442–443.)

Defendant argues that although he was *Mirandized*, the warnings were insufficient to purge the taint of his unlawful arrest because the interrogation began before the warnings were given. Defendant cites *Missouri v. Seibert* (2004) 542 U.S. 600, 605–606 (*Seibert*), a case which analyzes whether a two-step questioning technique in deliberate abuse of *Miranda* violates a defendant's Fifth Amendment right against self-incrimination.[10]

---

[10] We note defendant's argument is convoluted. His argument is made while analyzing the *Brown*, *supra*, 422 U.S. 590 attenuation factors as to whether the trial court's ruling failed to recognize and remedy a Fourth Amendment violation. It appears the People do not view defendant's argument this way; the People noted, "[Defendant] does not contend that the *Miranda* warnings were somehow inadequate or insufficient under the Fifth Amendment."

To the extent defendant also argues his Fifth Amendment rights were violated, we shall address whether the record shows a two-step tactic was employed deliberately by the sheriff's department to circumvent *Miranda*. (See, e.g., *People v. Sumagang* (2021) 69 Cal.App.5th 712, 727–728.)

In *Oregon v. Elstad* (1985) 470 U.S. 298, 309, the Supreme Court held that although *Miranda* requires suppression of an unwarned statement, "the admissibility of any subsequent statement" should turn on "whether [the statement] is knowingly and voluntarily made." (Cf. *Seibert*, *supra*, 542 U.S. at pp. 605–606 [a second statement provided after the defendant waived *Miranda* warnings was suppressed when the detective testified he made a " 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that [the suspect has] already provided once' "].)

The main consideration is voluntariness. (See *Oregon v. Elstad*, *supra*, 470 U.S. at p. 309.) The trial court rightly found defendant's statements given both before and after he was read his *Miranda* rights were voluntary. For example, defendant agreed to be transported to the sheriff's department for questioning regarding an investigation. Once defendant arrived at the sheriff's department, he was not arrested and spoke casually to the detectives. Further, there is no evidence the detectives intentionally withheld providing defendant his *Miranda* rights. Defendant's pre-*Miranda* statements, though incriminating as to who owned and drove the gray sedan, lacked detail and specifics of the crime. (Cf. *Seibert*, *supra*, 542 U.S. at p. 609 [an officer testified "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession was promoted"].) Defendant was offered water and took a break from the interview before he was read his *Miranda* rights. (*People v. Krebs* (2019) 8 Cal.5th 265, 310 ["the second round of interrogation alerted defendant that he had a 'real choice' whether to follow up on his earlier incriminating statements or 'stop talking' "].)

13.

Defendant's post-*Miranda* statements given at the sheriff's department were not inadmissible under the Fifth Amendment.[11]  Because we conclude the detectives did not attempt a two-step interrogation technique to circumvent *Miranda* protections, the *Miranda* admonition continues to weigh in favor of attenuation.

### 2.  Temporal Proximity and Intervening Circumstances

Next, we turn to the time between " ' "the Fourth Amendment violation to the procurement of the challenged evidence" ' " and consider it in connection with any intervening circumstances to determine whether there was attenuation.  (*People v. Lujano* (2014) 229 Cal.App.4th 175, 188; see *Gonzalez*, *supra*, 64 Cal.App.4th at p. 444 ["the temporal proximity factor is useless in determining whether the taint of an illegal arrest has dissipated unless it is considered in connection with the presence of intervening circumstances"].)  An intervening circumstance can be anything "sufficient to 'break the causal chain . . . between the illegal arrest and the statements made subsequent thereto.' " (*Gonzalez*, at p. 444.)

In *People v. De Juan* (1985) 171 Cal.App.3d 1110, 1123–1124, after an illegal detention and transportation by private investigators permitted by the police, the Fourth Appellate District held that the defendant's subsequent statements were admissible where the defendant's consent to engage in interrogation was " 'not induced by compulsion, intimidation, [or] oppressive circumstances' " but an act of the defendant's own free will. Once at the police department, the defendant was told he was not under arrest.  (*Id*. at p. 1124, italics omitted.)  Thereafter, the defendant "le[ft] without hinderance" and agreed to discuss the matter with detectives.  (*Ibid*.)  In denying defendant's motion to suppress, the *De Juan* court reasoned, "the taint of any . . . illegality was clearly dissipated by [the] defendant's free and voluntary consent to engage in the discussions, [the defendant's] free

---

[11] As stated above, defendant's pre-*Miranda* statements, except for those that related to identity or biographical information, were excluded by the trial court.

14.

and voluntary waiver of his *Miranda* rights and his expressed desire to discuss the matter and get it cleared up." (*Ibid*.)

Here, there was approximately two and one-half hours from the time of defendant's initial arrest and detainment to his voluntary confession.[12] Time periods under five and one-half hours "fall within the range that suggests the confession did not result from an intervening independent act of free will." (*Gonzalez, supra*, 64 Cal.App.4th at p. 447.)

However, defendant willingly agreed to be transported to the sheriff's department to engage in questioning. To that end, the detective thanked defendant for coming voluntarily, to which defendant replied, "[N]o problem." Defendant was not told he was under arrest at the time of the interview; defendant was not wearing handcuffs when he walked into the interview room or while he was being questioned by the sheriff's department. After Brock obtained defendant's first name, he told defendant, "This shouldn't take too long." Defendant replied, "All right. Cool." Defendant's agreement to be transported to the sheriff's department and his responses to the detective during the interview demonstrates defendant's willingness to engage in the discussion. This was an intervening circumstance to dissipate the taint. (See, e.g., *People v. De Juan, supra*, 171 Cal.App.3d at p. 1124 [the defendant's agreement to discuss the matter with detectives, jovial manner, and voluntary confession showed the defendant's statement was an act of free will]; cf. *People v. DeVaughn* (1977) 18 Cal.3d 889, 899–900 [confession suppressed, though preceded by *Miranda* warnings and a waiver of the defendant's rights

---

[12] The police conducted the traffic stop at approximately 2:35 p.m. About 40 minutes later, the sheriff's department arrived at the scene and asked defendant if he would speak to them. Defendant agreed and was driven to the sheriff's department, where he waited almost an hour before the interview began. Defendant confessed about an hour into the interview.

thereunder, where the defendant's confession was given within minutes of his illegal arrest, without any intervening circumstances, and obtained under pressure by police].)

The Second Appellate District in *Gonzalez*, *supra*, 64 Cal.App.4th at page 442 analyzed the *Brown*, *supra*, 422 U.S. 590 attenuation factors when it considered whether two separate confessions by the defendant, obtained by two different police agencies, were a product of the defendant's free will or the result of exploiting an illegal arrest. In *Gonzalez*, the first confession was suppressed, although the defendant waived his *Miranda* rights, because of police misconduct by the arresting agency, the short time between the defendant's arrest and confession, and the lack of intervening circumstances. (*Gonzalez*, at p. 447.) The court said, "The most damning factor . . . [was] the utter lack of probable cause for [the] defendant's arrest and the very clear indication its purpose was to take [the] defendant into custody and see what might turn up." (*Ibid*.) However, the second confession by the defendant was not suppressed, where the next day, while the defendant was still in custody, police officers from another agency interrogated the defendant and he confessed to another crime. (*Id*. at p. 448.) The admissibility of the second confession was supported by the lack of flagrancy since the interrogating officers were not cooperating with the first agency and the focus of the interrogation was on a different crime. (*Id*. at p. 450.)

Relying on *Gonzalez*, *supra*, 64 Cal.App.4th at pages 449–450, defendant contends his agreement to be transported by the sheriff's department and engage in questioning was not an intervening circumstance because although defendant was stopped by the police department, and transferred by the sheriff's department, a different agency, the two agencies were working together and were both on the scene the night of the shooting. Defendant further argues there is no evidence of defendant's subjective awareness that the sheriff's department was a different agency than the police department.

We do not find defendant's argument compelling. Unlike the facts of *Gonzalez*, *supra*, 64 Cal.App.4th at pages 448–450, neither the cooperation of the police and sheriff's department in this case nor defendant's subjective belief regarding the different agencies is pivotal in determining whether there was sufficient attenuation. Defendant's agreement to go to the sheriff's department and willingness to engage in the interrogation after waiving his *Miranda* rights was an act of his own free will, weighing in favor of attenuation. (*Wong Sun v. U.S.* (1963) 371 U.S. 471, 486 [requirement that there be an "act of free will to purge the primary taint of the unlawful invasion"].)

### 3. Flagrancy

We turn to the final *Brown* factor, the flagrancy and purposefulness of police misconduct. "While the first two factors identify forces—time and intervening circumstances—that may tend to attenuate the causal connection between the misconduct and the discovery of evidence, the focus of the third factor is different: It ' "is directly tied to the purpose of the exclusionary rule—deterring police misconduct." ' " (*People v. McWilliams* (2023) 14 Cal.5th 429, 446.) "The greater the degree of purposefulness or flagrancy associated with the police misconduct, the greater the justification required to admit evidence obtained through the misconduct." (*Ibid.*) When analyzing the *Brown* factors, purposefulness is found when law enforcement conducts a "suspicionless fishing expedition 'in the hope that something would turn up.' " (*Utah v. Strieff* (2016) 579 U.S. 232, 242.)

In *People v. McWilliams*, *supra*, 14 Cal.5th at page 447, a security guard in a business parking lot reported suspicious activity involving two individuals riding bicycles and shining flashlights into cars. When a police officer responded to the suspicious activity, he found the defendant alone and reclined inside a car, with no bicycle or flashlight in sight. Rather than approaching the defendant to ask him for information, the officer instead ordered the defendant out of the car for asserted safety concerns and ran a records check. (*Ibid.*) The records check revealed a parole condition authorizing

searches without suspicion. (*Id*. at p. 449.) Our Supreme Court held the officer "offered no basis—rooted in experience or otherwise—for believing [the defendant] was involved in the suspicious parking-lot activity he had set out to investigate" (*id*. at p. 448) and his decision to detain the defendant merely because he was in the broad vicinity of reported suspicious activity was purposeful (*id*. at pp. 448–449). The seizure of the evidence found incident to the illegal arrest was excluded. (*Id*. at p. 449.)

In contrast, our Supreme Court in *People v. Brendlin*, *supra*, 45 Cal.4th at page 271, found nothing in the record to indicate the deputy who instigated the stop was engaged in a fishing expedition. In that case, the officer said he stopped the defendant's vehicle because cars with expired registration tabs and temporary stickers, in his experience, are usually operated illegally. (*Ibid*.) Although this explanation was insufficient to justify a temporary detention of the defendant to permit further investigation, "the insufficiency was not so obvious as to make one question [the officer's] good faith in pursuing an investigation of what he believed to be a suspicious registration, nor [did] the record show that [the officer] had a design and purpose to effect the stop " 'in the hope that something [else] might turn up.' " (*Ibid*.)

With this authority in mind, we turn to the facts of this case. Here, an undercover police officer saw defendant's car outside of a residence which matched the "suspect description for a shooting vehicle." The undercover officer also saw defendant, who was identified as matching the photograph of the suspect in the homicide that occurred a few hours prior, exit the residence and get into the passenger seat of a silver car with a female driver. Celedon heard information over a radio broadcast from the undercover officer that defendant, a "suspect in [a] homicide investigation" was a passenger in a silver car that was fleeing the area. The undercover officer provided a description of the vehicle, and the direction in which the silver car was traveling. Celedon saw the silver car that matched the vehicle description provided over the broadcast. He also saw that the silver

car had "paper plates." When Celedon and his partner stopped the silver car, defendant said his name and provided identification matching the murder suspect.

The police misconduct here was not so flagrant to question the officers' pursuit of an investigation of what they believed to be a murder suspect that was seen fleeing "westbound" in a car matching the description of the silver car defendant was riding in, with a female passenger. (*People v. Fields* (1984) 159 Cal.App.3d 555, 564–565 [detention lawful where the defendant matched suspect description containing unique distinguishing features including sex, height, race, age, and attire, although observed six hours after the crime, this was not such a lengthy period in light of all the other factors]; *People v. McCluskey* (1981) 125 Cal.App.3d 220, 226–227 [police officer was justified in stopping a vehicle and detaining its occupants when he received radio dispatch that a robbery had occurred minutes earlier in the vicinity, he observed that the suspect's car was traveling in a direction consistent with the suspect's involvement in the robbery, and he received the suspect's description which included "ethnic origin, attire, sex and age"]; cf. *People v. Bates* (2013) 222 Cal.App.4th 60, 71 [the stop of a car was found purposeful for the court's *Brown* attenuation analysis when the officer stopped the car without any observation of possible wrongdoing based only on a "hunch that [the] defendant might be in the vehicle"].)

The trial court found the initial detention unlawful because part of Celedon's justification for stopping the silver car was due to the false "paper plate" violation. However, the facts of this case do not match those where law enforcement provided no explanation for a stop or based the stop on a mere guess or conjecture without a specific description of the vehicle or the perpetrator. (Cf. *People v. McWilliams*, *supra*, 14 Cal.5th at p. 447 [the police officer's basis to suspect that the defendant was violating the law was not merely insufficient, "it was essentially nonexistent"].)

Here, Celedon and his partner had reasonable suspicion that a murder suspect was seen fleeing the area in which they were located. Celedon and his partner also had a

19.

description of the silver car and who was seen getting into the car, including defendant and a female driver. The silver car Celedon stopped matched the description of the car defendant was a passenger in. These facts do not demonstrate the high degree of flagrancy seen in cases where the stop is simply made "in the hope that something [else] might turn up." (*Brown*, *supra*, 422 U.S. at p. 605.) Thus, we do not find the officers' misconduct in this case to be such a high degree of purposefulness or flagrancy as to warrant suppression of defendant's voluntary statements made in this case.

Weighing the *Brown* factors, we find the facts of this encounter demonstrate that defendant's statements made at the sheriff's department were not the fruit of the unlawful seizure.

## II.     Application of Section 1170, Subdivision (b) to Plea Agreements

We requested supplemental briefing regarding whether defendant's sentence pursuant to a stipulated plea agreement was unauthorized considering Senate Bill No. 567's amendments to section 1170, subdivision (b) and rule 4.420(g).

Defendant contends his sentence must be vacated and his case remanded for resentencing with directions for the trial court to apply section 1170, subdivision (b) and rule 4.420(g) to determine whether any other aggravating circumstance may properly support the upper term or if defendant seeks to waive the requirements of section 1170, subdivision (b). The People argue defendant agreed to the stipulated plea agreement, the trial court did not exercise its discretion when imposing the upper term and the firearm enhancement based on dual use of facts, and section 1170, subdivision (b) is inapplicable. We agree with the People.

### A. Additional Background

On January 20, 2023, pursuant to a stipulated plea agreement with the People, defendant agreed to a fixed term of 14 years as follows:

> "[Defendant] will plead [to] the upper term of 11 years [§ 192; count 2].
> That 11 years will be enhanced by three years pursuant to . . . [s]ection

20.

12022.5[, subdivision ](a), which is . . . a gun enhancement . . . [f]or a total of 14 years."

Prior to sentencing, the trial court noted:

"[D]efendant admitted a factor of aggravation, pursuant to . . . [r]ule 4.421, subdivision (a)(2), which alleges the defendant used a weapon in the commission of the offense . . . use and consideration of this aggravating factor would constitute dual use and should not be considered for purposes of selecting the upper term.  So [the parties] discussed this in chambers off the record.  [¶] . . . [¶]  . . . we [also] discussed . . . that in order to accept the benefit of the plea bargain . . . defendant [could] waive any error in the [c]ourt's consideration of that circumstance in aggravation and allow the [c]ourt to consider that for purposes of selecting the upper term, consistent with the terms of the plea agreement."

In response, defense counsel said he discussed the dual use of facts with defendant and "[defendant] wanted to enter a plea . . . knowingly and intelligently . . . for the agreed-upon term of 14 years . . . ."  Defense counsel further said, "[Defendant] is willing to waive any type of dual use to make sure he gets the benefit of the bargain."  Thereafter, the trial court explained to defendant the recent changes in the law pursuant to Senate Bill No. 567, and defendant knowingly and voluntarily waived any error under section 1170, subdivision (b)(5) so he could be sentenced pursuant to the stipulated plea.  As such, the court made the following finding:  "[D]efendant has knowingly, intelligently and voluntarily waived any error in order for the [c]ourt to make dual use of that circumstance in aggravation to . . . impos[e] . . . the upper term."

Thereafter, at the sentencing hearing, the trial court sentenced defendant to a determinate term of 14 years in accordance with the plea agreement.  The court ordered:

"I . . . find a factor in aggravation, pursuant to [r]ule 4.421, subdivision (a)(2), and the defendant has waived any errors so the [c]ourt may consider that as a circumstance supporting the upper term of 11 years, consistent with the terms of the plea.  The [c]ourt finds that the terms of that plea are in the interest of justice and has accepted the terms of the plea.  [¶]  . . . [D]efendant is sentenced to . . . the upper term of 11 years.  Said sentence [is] enhanced by three years . . . the low term [pursuant to] [s]ection 12022.5, subdivision (a), for a total fixed term of 14 years in state prison."

21.

### B. Standard of Review

Questions of statutory interpretation are reviewed de novo. (*People v. Olay* (2023) 98 Cal.App.5th 60, 65.) " ' " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning.' " ' " (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) " '[W]e consider the language of the entire scheme and related statutes, harmonizing the terms when possible.' " (*Ibid.*) "If any ambiguity remains, we may examine the legislative history and the stated purpose of the scheme to guide our interpretation." (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 632–633.)

### C. Senate Bill No. 567

Effective January 1, 2022, Senate Bill No. 567 amended section 1170, subdivision (b) and now states that the middle term is the presumptive maximum unless there are circumstances in aggravation that justify imposition of the upper term and the facts underlying those circumstances are stipulated to by defendant or found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. (§ 1170, subd. (b)(1), (2).) Even if circumstances in aggravation are found true, under section 1170, subdivision (b)(5), "[t]he court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (See *People v. Jones* (2009) 178 Cal.App.4th 853, 862; accord, rule 4.420(g) [fact underlying an enhancement may not be used to impose the upper term unless the court strikes the enhancement].)

### D. Analysis

Based on these principles, we turn to the issue of whether section 1170, subdivision (b) applies to sentences imposed pursuant to stipulated plea agreements entered after the effective date of the amendments and defendant knowingly waived any error under section 1170, subdivision (b) to get the benefit of the stipulated plea bargain.

## 1. Waiver

At the outset, we must address defendant's express waiver of any claim of error with respect to Senate Bill No. 567 and section 1170, subdivision (b). The trial court explained the changes in the law pursuant to Senate Bill No. 567 on the record and defendant knowingly and voluntarily waived his appellate rights to any later claim of error under section 1170, subdivision (b) to receive the benefit of the plea bargain. Defendant expressly identified the type of sentencing error contemplated, dual use of facts, and orally relinquished his right to claim error with respect to that issue. We further note defense counsel orally told the court before sentencing that defendant is "willing to waive" his right to appeal his sentence as to whether section 1170, subdivision (b) was appropriately applied. Defendant does not argue on appeal that he did not knowingly or voluntarily waive any error under section 1170, subdivision (b) and defendant fails to consider the impact of his express waiver on this case.

We find defendant knowingly and voluntarily waived his appellate claim of error with respect to the dual use of facts under section 1170, subdivision (b). (*People v. Orellana* (2022) 74 Cal.App.5th 319, 325 ["an express waiver of the right to appeal in a negotiated plea agreement is valid and enforceable, provided that the waiver is knowing, intelligent, and voluntary"].) Nevertheless, we exercise our discretion to reach the merits as to whether section 1170, subdivision (b) applies to defendant's stipulated plea agreement. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772 [an appellate court has authority to address a waived claim on the merits].)

## 2. Merits

The California Courts of Appeal are split on whether a defendant who received an upper term pursuant to a plea agreement that included a stipulated sentence, is entitled to remand under Senate Bill No. 567. The issue is pending before our Supreme Court. (Compare *People v. Sallee* (2023) 88 Cal.App.5th 330, 333–334, review granted Apr. 26, 2023, S278690 (*Sallee*) [the defendant not entitled to remand] and *People v. Mitchell*

23.

(2022) 83 Cal.App.5th 1051, 1057–1059, review granted Dec. 14, 2022, S2773143 (*Mitchell*) [same] with *People v. De La Rosa Burgara* (2023) 97 Cal.App.5th 1054, 1063–1064, review granted Feb. 21, 2024, S283452 (*De La Rosa Burgara*) [the defendant entitled to remand] and *People v. Todd* (2023) 88 Cal.App.5th 373, 380–381, review granted Apr. 26, 2023, S279154 (*Todd*) [same].)

In *Sallee*, this court concluded the trial court did not exercise discretion regarding the sentencing triad when it imposed a stipulated sentence set out in the negotiated plea agreement, and thus the amendments to section 1170 brought about by Senate Bill No. 567 were inapplicable under the plain language of the statute. (*Sallee*, *supra*, 88 Cal.App.5th at p. 338, rev. granted.) The *Sallee* court explained, since "the court imposed a stipulated sentence pursuant to a negotiated plea agreement[,] . . . the court's discretion was limited to approving or rejecting the bargain. The court did not exercise discretion to select between the lower, middle, or upper term based on any aggravating or mitigating circumstances . . . the court was not authorized to modify the terms of the agreement by exercising discretion as to the sentencing triad, while leaving the plea agreement otherwise intact." (*Ibid.*; see *People v. Segura* (2008) 44 Cal.4th 921, 931.) Likewise, in *Mitchell*, the First Appellate District reasoned that since "[t]he court had no opportunity to exercise any discretion in deciding whether the imposition of the upper, middle, or lower term would best serve 'the interests of justice' under . . . section 1170, subdivision (b)" (*Mitchell*, *supra*, 83 Cal.App.5th at p. 1058, rev. granted) the changes made by Senate Bill No. 567 were inapplicable to stipulated sentences. (*Mitchell*, at pp. 1058–1059.)

Here, defendant agreed to a term of 14 years pursuant to a stipulated plea and the trial court sentenced defendant according to the terms of the plea agreement. The court did not exercise its discretion to impose the upper term and had no ability to strike the enhancement while leaving the stipulated plea agreement intact. (See *Sallee*, *supra*, 88 Cal.App.5th at p. 338, rev. granted ["the court was not authorized to modify the terms of

the agreement by exercising discretion . . . while leaving the plea agreement otherwise intact"]; see also rule 4.420(g) ["[t]o comply with section 1170[, subdivision ](b)(5), a fact charged and found as an enhancement may be used as a reason for imposing a particular term only if the court has *discretion* to strike the punishment for the enhancement and does so" (italics added)].) In fact, the court discussed this issue on the record with the parties. Defendant was also informed the admitted aggravating circumstance was based on the same facts as the firearm enhancement, which could not be used under section 1170, subdivision (b). The court asked defendant whether he wanted to waive any claim of error with respect to this issue for the benefit of the plea bargain, since the court lacked discretion to alter the terms of the plea. Defendant agreed to waive any claim of error.

We further note defendant knowingly and voluntarily waived his rights to a court or jury trial by entering into a stipulated plea agreement. This is further corroborated by defendant's clear, unequivocal waiver of any error under section 1170, subdivision (b), so that the plea agreement could remain intact and defendant could reap its benefits. Thus, the concern raised in *Cunningham v. California* (2007) 549 U.S. 270, 293, "that a defendant's Sixth Amendment rights are violated when aggravating facts to support an upper term sentence are not found by a jury beyond a reasonable doubt does not exist here" (*Mitchell*, *supra*, 83 Cal.App.5th at p. 1059, rev. granted, italics omitted).

Moreover, this is not a situation where we are dealing with the retroactive application of Senate Bill No. 567. Rather, section 1170, subdivision (b) was amended more than a year before defendant was sentenced in this case. As set forth above, the parties and trial court acknowledged they were aware of the changes and discussed them on the record.

Defendant now urges us to accept the holdings in *Todd* and *De La Rosa Burgara*. These cases found the defendants' sentences unauthorized for failure to properly apply section 1170, subdivision (b) to the defendants' stipulated plea agreements. (*Todd*, *supra*,

88 Cal.App.5th at p. 381, rev. granted; *De La Rosa Burgara*, *supra*, 97 Cal.App.5th at pp. 1063–1064, rev. granted.)

Crucial to both *Todd* and *De La Rosa Burgara* was the finding that the newly amended Senate Bill No. 567 was enacted after the defendants in those cases were sentenced.  (See *Todd*, *supra*, 88 Cal.App.5th at pp. 378–379, rev. granted [holding plea agreements were not insulated from future changes in the law]; *De La Rosa Burgara*, *supra*, 97 Cal.App.5th at pp. 1064–1065, rev. granted [holding the defendant should be offered the opportunity to waive the requirements of newly amended § 1170, subd. (b) and state whether he either stipulates to an aggravating circumstance that justifies the imposition of the upper term or desires a jury trial or court trial on any aggravating circumstances alleged by the prosecutor].)  However, here, defendant received the opportunity to waive the requirements of section 1170, subdivision (b), and did so.

Accordingly, Senate Bill No. 567 is not applicable since the trial court did not exercise its discretion when it imposed the stipulated sentence set out in the negotiated plea agreement.  Moreover, defendant waived the requirements under section 1170, subdivision (b).

## DISPOSITION

The judgment is affirmed.

DETJEN, Acting P. J.

WE CONCUR:

SMITH, J.

SNAUFFER, J.

26.